Richard ROE, an infant, by Robert Roe, his parent et al., Plaintiffs-Appellants,

George Patient et al., Intervenors-Appellants,

v.

Hollis S. INGRAHAM, as Commissioner of Health of the State of New York, Defendant-Appellee.

Nos. 947, 948, Dockets 73–1562, 73–1582.

United States Court of Appeals, Second Circuit.

Argued May 4, 1973.

Decided May 24, 1973.

Michael Lesch, New York City (Barry L. Mendelsen, Solomon Z. Ferziger, and Shea Gould Climenko & Kramer, New York City, of counsel), for plaintiffs-appellants.

H. Miles Jaffe, New York City (Norwick, Raggio & Jaffe, New York City, of counsel), for intervenors-appellants.

A. Seth Greenwald, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., of the State of New York, and Samuel A. Hirshowitz, First Asst. Atty. Gen., of counsel), for defendant-appellee.

Before FRIENDLY, Chief Judge, HAYS, Circuit Judge, and JAMESON,* District Judge.

FRIENDLY, Chief Judge:

This appeal from an order of the District Court for the Southern District of New York, 357 F.Supp. 1217 dismissing complaints in actions under the civil rights statute, 42 U.S.C. § 1983, as jurisdictionally implemented by 28 U.S.C. § 1343(3), relates to the New York State Controlled Substances Act, N.Y.Laws 1972, ch. 878, amending N.Y. Public Health Law §§ 3300–96, effective April 1, 1973, McKinney's Consol.Laws, c. 45.

The Controlled Substances Act represents a comprehensive effort by the State, aimed primarily at controlling the abuse caused by diversion of lawfully manufactured and prescribed dangerous drugs into unlawful uses. Broadly speaking, the scheme of the statute is to classify each such drug in one of five schedules, see Public Health Law § 3306, depending on the degree of harm its abuse may cause and the extent of its lawful medical uses, with restrictions imposed on distribution of the drug varying in accordance with the schedule in which it is placed. Schedule I lists drugs with a high potential for abuse, for which there is no generally recognized medical use, including certain opiates and opium derivatives, various hallucinogenic substances, and marijuana; § 3330 forbids prescribing any such substance except for strictly limited purposes detailed in Title III. Schedule II lists substances having a high potential for abuse leading to severe psychological or physical dependence, but having accepted medical use in some cases; included in this schedule are such major narcotics as cocaine, concentrated codeine, morphine, Demerol, and other opiates, and the amphetamines. Schedule II drugs may be prescribed and dispensed only in the manner hereafter described. Schedules III, IV and V list other drugs of medical utility having progressively less severe effects on the central nervous system; these may be prescribed and dispensed in less onerous ways unnecessary here to detail.

Plaintiffs' complaints are particularly directed at the procedure established for the prescription of Schedule II drugs. Section 3338(2) directs that, except for emergency oral prescriptions,[1] sub-

* Of the United States District Court for the District of Montana, sitting by designation.

1. The procedure for these, detailed in § 3334, ultimately results in the same filing with the Department of Health of a copy of the prescription bearing the name of the patient about which plaintiffs complain.

stances listed in Schedule II may be dispensed only upon an official New York State prescription form. These forms, to be prepared and issued by the Department of Health in groups of 100, are to be in triplicate and serially numbered, § 3338(1). So far as here relevant, the prescription must contain the name, address and age of the patient; the name, address, registration number, telephone number and handwritten signature of the prescribing practitioner; specific directions for use; and the date upon which the prescription was actually signed, § 3332(2). When the practitioner also dispenses, he must retain the original for five years and file the two copies with the Department of Health not later than the fifteenth day of the month following that in which the substance was delivered, § 3331(6). When dispensing is to be done by a pharmacist, the practitioner must retain a copy for five years, § 3332(4), the pharmacist must retain the original for a like period, and the pharmacist must file a copy endorsed with the date of delivery, the registration number of the pharmacy, and his signature, with the Department of Health not later than the fifteenth day of the month following that in which the substance was delivered, § 3333. The information contained in the prescriptions filed with the Department of Health is afforded some degree of confidentiality by § 3371, which provides:

1. No person, who has knowledge by virtue of his office of the identity of a particular patient or research subject, a manufacturing process, a trade secret or a formula shall disclose such knowledge, or any report or record thereof, except:

(a) to another person who by virtue of his office is entitled to obtain such information; or

(b) pursuant to judicial subpoena or court order in a criminal investigation or proceeding; or

(c) to an agency, department of government, or official board authorized to regulate, license or otherwise supervise a person who is authorized by this article to deal in controlled substances, or in the course of any investigation or proceeding by or before such agency, department or board.

2. In the course of any proceeding where such information is disclosed, except when necessary to effectuate the rights of a party to the proceeding, the court or presiding officer shall take such action as is necessary to insure that such information, or record or report of such information is not made public.

This action against the Commissioner of Health was brought by three infants receiving prescriptions for medications listed under Schedule II, two physicians who prescribe drugs listed under that schedule, and the Empire State Physicians Guild, Inc. A post-operative cancer patient who receives Hycodan and Percodan, both Schedule II drugs, a woman suffering from migraine who receives Demerol, a physician who prescribes for one of these patients, and the American Federation of Physicians and Dentists were permitted to intervene as plaintiffs and also to file a separate complaint. Alleging that the compelled disclosure to the Department of Health of the identity of patients for whom Schedule II drugs have been prescribed unconstitutionally invades the patient's right to privacy, infringes on the doctor's right to prescribe treatment solely on the basis of medical considerations, and discriminates against persons suffering from certain diseases by requiring their identification to a governmental agency as a condition to receiving medical treatment, plaintiffs sought temporary and permanent injunctive relief and asked that a three-judge court be convened, 28 U.S.C. § 2281, to consider their complaint. An affidavit supporting the application for a temporary restraining order annexed a Memorandum to members of the New York Legislature from the Chairman of the Temporary State Commission to Evaluate the Drug Laws, which had proposed the

New York State Controlled Substances Act. This Memorandum was submitted because, in addition to elaborating the reasons thought to require the strict control of Schedule II substances, it demonstrated that information from the official prescription would be coded into a computer. The report explained that the computer would be asked certain questions at regular intervals. These questions, which "will be formulated at the highest administrative level," would relate to physicians who had "prescribed and dispensed a greater amount of a Schedule II substance than could possibly be justified by the nature of their practice" and to "situations arising from lost or stolen prescriptions." The Memorandum stated, however, that the proposed plan would not "make use of massive print-outs of patients' names," or, indeed, disclose identifying data about any patient "unless, based upon previous reports, it is clear that such patient has been using stolen or forged prescriptions." [2]

The district court issued a temporary restraining order against the Commissioner's accepting for filing or processing forms containing the identity of patients receiving prescriptions for Schedule II drugs or requiring physicians or pharmacists to file such forms, and directing the Commissioner to maintain in a sealed vault such forms as were received. It also set an early hearing on the motion to convene a three-judge court. The State responded with a motion to dismiss the complaint. It submitted an affidavit of Dr. Robert Whalen, Second Deputy Commissioner of the Department of Health. This developed the reasons, discussed below, which were thought to require the filing of the prescriptions with the patients' names on them. Dr. Whalen alleged that similar multiple prescription procedures had been in effect in three other states, for considerable periods, with beneficial effects. He also said that the exception in § 3371(1)(a) allowing disclosure "to another person who by virtue of his office is entitled to obtain such information" was "to allow disclosure internally within the Department to those with a controlled substance responsibility." Annexed to his affidavit were a manual of the State Commissioner of Health entitled "Security of Computer Systems," another manual of the State Commissioner of Health dealing generally with confidential information, and a policy statement dealing specifically with security from unauthorized disclosure of information obtained by the Department of Health under the Controlled Substances Act. Relying in part on this affidavit, which the district judge took to demonstrate that the Department of Health was "taking all necessary steps to maintain the security of the computerized information," he found no substantial constitutional question and dismissed the complaint for lack of federal jurisdiction. He continued the temporary restraining order for three days to allow plaintiffs to seek a further stay from this court after filing notice of appeal, and another panel of this court continued so much of it as required the Commissioner to retain prescriptions received in a sealed vault pending an expedited appeal.[3]

In the face of recent strong advocacy of the abolition of the three-judge court requirement in constitutional cases,[4] a

2. The motion for a temporary injunction was also supported by affidavits of parents of the infant plaintiffs, objecting to the names of their children and the medications they are receiving being disclosed to the state and recorded in the state's data bank, and affidavits of physicians asserting that the disclosure requirement would make them reluctant to prescribe, and patients reluctant to accept, Schedule II drugs, thus causing non-medical considerations to interfere with the doctors' determination as to the appropriate medical treatment.

3. It is clear that the modified restraining order does not relieve physicians and pharmacists from performing the duties imposed on them by the statute under attack. The Commissioner is at liberty to announce this if he deems it desirable.

4. See Report of the Study Group on the Caseload of the Supreme Court 28–30

unanimous Supreme Court has just defined the standard permitting a single judge to dismiss a complaint seeking an injunction on the ground of unconstitutionality in the most limiting terms the Court has ever used. In Goosby v. Osser, 409 U.S. 512, 516, 93 S.Ct. 854, 858, 35 L.Ed.2d 36 (1973), it said:

Section 28 U.S.C. § 2281 does not require the convening of a three-judge court when the constitutional attack upon the state statutes is insubstantial. "Constitutional insubstantiality" for this purpose has been equated with such concepts as "essentially fictitious," Bailey v. Patterson, 369 U.S. 31, 33, 82 S.Ct. 549, 551, 7 L.Ed.2d 512 (1962), "wholly insubstantial," *ibid,* "obviously frivolous," Hannis Distilling Co. v. Baltimore, 216 U.S. 285, 288, 30 S.Ct. 326, 327, 54 L.Ed. 482 (1910), "obviously without merit," Ex parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 4–5, 78 L.Ed. 152 (1933). The limiting words "wholly" and "obviously" have cogent legal significance. In the context of the effect of prior decisions upon the substantiality of constitutional claims, those words import that claims are constitutionally insubstantial only if the prior decisions inescapably render the claims frivolous; previous decisions which merely render claims of doubtful or questionable merit do not render them insubstantial for the purposes of 28 U.S.C. § 2281. A claim is insubstantial only if "its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy." Ex parte Poresky, *supra,* 290 U. S. at 32, 54 S.Ct., at 4; see also Levering and Garrigues Co. v. Morrin, *supra,* 289 U.S. 103, 105, 53 S.Ct. 549, 550, 77 L.Ed. 1062 (1933); Hannis Distilling Co. v. Baltimore, *supra,* 216 U.S. at 288, 30 S.Ct. at 327; McGilvra

(1972); 1970 Report of the Proceedings of the Judicial Conference of the United States, at 78–79; Burger, The

v. Ross, 215 U.S. 70, 80, 30 S.Ct. 27, 31, 54 L.Ed. 95 (1909).

▮▮▮ Despite the severity of this standard, we should have little difficulty in sustaining the district court if plaintiffs' attack had been limited to the discrimination between the disclosure requirements applicable to prescriptions for drugs in Schedule II and those applicable to drugs in Schedules III, IV and V. It is apparent that the limitation of the central filing requirement to Schedule II drugs was designed for the specific purpose of confining the resulting intrusion into privacy to those drugs whose unlawful distribution entails the greatest danger to patients and the public. The legislative purpose in making the differentiation being thus permissible, indeed, laudable, the courts will not assume the task, for which they are conspicuously unfitted, of inquiring whether every drug was properly placed by the Legislature in one schedule rather than another. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S.Ct. 337, 55 L.Ed. 369 (1911); Metropolis Theater Co. v. City of Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 57 L.Ed. 730 (1913). The district court likewise was clearly correct in dismissing the plaintiffs' claim that the Act's imposition of stricter confidentiality requirements upon the records of addicts participating in drug maintenance programs than on the information relating to Schedule II drug prescriptions denied them equal protection of the laws. As the district judge pointed out addicts have understandably been reluctant to bring their drug use to the light of day, and the state could reasonably have believed that only the strictest confidentiality, including protection from disclosure to law enforcement authorities, would encourage them to join treatment programs.

This, however, was only a part, indeed a relatively minor part, of plaintiffs' complaints. The patients' main attack

State of the Federal Judiciary—1972, 58 A.B.A.J. 1049, 1053 (1972).

is that the requirement of filing with the Department of Health is an impermissible invasion of a constitutional right to privacy with respect to the status of their health and the medical treatment they are receiving, and the physicians contend that the danger of disclosure impairs a constitutional right to make their decisions solely on the basis of medical considerations.[5]

The concept that privacy may be a constitutional right enjoying protection against governmental intrusions other than those banned by specific provisions of the Bill of Rights, notably the First and Fourth Amendments, see Stanley v. Georgia, 394 U.S. 557, 564–566, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Katz v. United States, 389 U.S. 347, 351–353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), was first explicitly stated in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).[6] That decision, along with Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), can be viewed as forecasting recognition of a constitutional right of men and women to decide, free of governmental interference, whether to minimize the risks of conception from sexual intercourse, although *Griswold* focused on the provision of the Connecticut statute proscribing the *use* of contraceptives and the attendant horrors of enforcement in the case of married persons, 381 U.S. at 485–486, 85 S.Ct. 1678, and *Eisenstadt* was rested on the equal protection clause. Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), went further and held that a woman's right to terminate her pregnancy was a "fundamental" constitutional right, subject to regulation only on the basis of a "compelling" state interest, which was found not to exist during the

first trimester and to exist only in a limited degree in the second. Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L. Ed.2d 201 (1973), took a still further step by recognizing a pregnant woman's constitutional right to make the abortion decision on the basis of advice from her own physician without the approval of a hospital committee or the concurrence of other doctors.

Although, as we recently indicated in Rosenberg v. Martin, 478 F.2d 520, at 524 (2 Cir. 1973), the right to privacy which thus far has been granted constitutional protection relates only to "the most intimate phases of personal life," having to do with sexual intercourse and its possible consequences, it is not "obvious" that the right will be thus confined. Indeed, the Court's recognition in Roe v. Wade, *supra,* 410 U.S. at 153, 93 S.Ct. at 727, that the right to privacy is "founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action" itself suggests that the right may not be so closely cabined. See, for an adverse criticism, Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 82 Yale L.J. 920 (1973). As Mr. Justice Stewart stated in his concurrence in *Roe,* 410 U.S. at 169, 93 S.Ct. at 735, quoting Mr. Justice Harlan's dissenting opinion in Poe v. Ullman, 367 U.S. 497, 543, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), the liberty guaranteed by the due process clause "is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, . . . and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state

5. The standing of the physicians seems to be established by Griswold v. Connecticut, 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d (1965), and Doe v. Bolton, 410 U.S. 179, 185, 93 S.Ct. 739, 35 L. Ed.2d 201 (1973). However, since their claims are less impressive than those of the patients, we will confine our discussion of the merits to the latter.

6. There are passages in Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 536, 541 (majority opinion of Douglas, J.), 546–547, 62 S.Ct. 1110, 86 L.Ed. 1655 (concurring opinion of Jackson, J.) (1942), which may be regarded as harbingers.

needs asserted to justify their abridgement."

■ If there is anything "obvious" about the constitutional right to privacy at the present time, it is that its limits remain to be worked out in future cases. Should the constitutionally protected zone of privacy be extended beyond the area already recognized, the individual's interest in keeping to himself the existence of his physical ailments [7] and his doctor's prescriptions for them would lie rather close in the continuum.[8] If New York had passed a statute directing that all prescriptions, or even all prescriptions for Schedule II drugs, must be published in the press, we do not think the State would have seriously contended, still less that the district judge would have held, that a constitutional attack was "obviously frivolous." That is enough to show that the question whether the right of privacy here asserted by the patients does enjoy some degree of constitutional protection is a substantial one. Assuming that such a constitutionally protected right does exist, the plaintiffs have raised a further question whether the impairment of that right was justified by some larger interest which the State is entitled to pursue.

The right to privacy in matters such as those here at issue surely is not absolute. This is shown by the rulings in Roe v. Wade, *supra,* 410 U.S. at 152, 93 S.Ct. 705, permitting restrictions on the abortion decision during the second trimester of pregnancy and prohibition of it during the third. Also, we do not read the portion of Doe v. Bolton, *supra,* 410 U.S. at 198, 93 S.Ct. 739, striking down Georgia's "two doctor concur-

rence" requirement as meaning that a state is wholly without power to regulate the practice of medicine or the activities of physicians except by professional censure, deprivation of licenses, or enforcement of the criminal law. Indeed, plaintiffs seem to concede that their constitutional rights were not violated by the previous New York laws, which required prescriptions for narcotic drugs to bear the full name and address of the patient, and the name, address, registration number and signature of the physician, former Public Health Law § 3301(32) (McKinney 1971); required pharmacists to retain copies of prescriptions for two years, former Public Health Law § 3322(1)(c); and allowed inspection of them by state and federal law enforcement authorities as well as the Department of Health, former §§ 3322(1)(c), 3334(1).

New York has advanced powerful arguments in support of the requirement of central filing of prescriptions for Schedule II drugs. The most important are that only by such filing, now complemented by the computer's ability to answer appropriate inquiries, can the State readily detect a number of serious abuses—the same patient going from doctor to doctor and thereby obtaining quantities of Schedule II drugs greater than his legitimate medical needs; over-prescription by doctors; and the theft or forgery of prescriptions. Each of these abuses leads to an individual's possession of quantities of these dangerous drugs which would be seriously harmful if used and afford the opportunity for sale into illicit drug channels. Without questioning the seriousness of the problem, plain-

---

7. While the State correctly points out that the prescription form does not require a description of the illness, plaintiffs counter that, at least for some of the drugs in Schedule II, many members of the public know the ailments for which such drugs are commonly prescribed. To take perhaps the most obvious example, most informed people would associate large dosages of Demerol with an ailment causing serious pain. It is immaterial

that the ailment usually is not one that should arouse any emotion toward the victim save sympathy; most people simply do not want their ailments to be generally known.

8. Indeed, there is language in Doe v. Bolton, *supra,* 410 U.S. at 194, 93 S.Ct. 739, from which it could be argued that the Court has already taken the step of extending constitutional protection to the privacy of the doctor-patient relationship.

tiffs respond that these abuses could be adequately controlled without central filing, or by central filing without patients' names, and that the added efficiency is not worth the price in terms of risk of disclosure.

 On this last point something turns on how great the risk is. While the Constitution does not condemn a state to using ineffective means in dealing with a problem as serious as the use of the opiates and stimulants listed in Schedule II, it may well condition use of a more effective means which involves a danger to constitutionally-protected privacy on the taking of all reasonable precautions to limit the risk. The complaints, and other material of which we may take judicial notice, are not conclusive on this score. Although Dr. Whalen may be correct in asserting that § 3371(1)(a) was intended only to allow disclosure of prescription information to Department of Health officials working in the area, the statutory language is so open-ended that full exploration of how confidentiality is in fact being preserved may be required. If it were clear that the State had taken or proposed to take effective steps, by regulation or otherwise, to limit access to the patients' names on the prescription forms as rigidly as is consistent with accomplishment of the asserted statutory purpose, the grounds for constitutional attack might disappear. But the district court was not entitled to dismiss the complaint on the basis of the State's assertions that it has already done this. The Supreme Court stated long ago in Ex parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 4, 78 L.Ed. 152 (1933), that "The existence of a substantial question of constitutionality must be determined by the allegations of the bill of complaint." See also Goosby v. Osser, *supra*, 409 U.S. at 521, 93 S.Ct. 860 n. 7. Looking at these allegations, and also at the Memorandum of the Temporary State Commission to Evaluate the Drug Laws which was annexed to the moving affidavit of plaintiffs' counsel, and the various state manuals, as we think we may, we do not be-

lieve that, under the strict test announced in Goosby v. Osser, *supra*, the complaint could properly have been dismissed without further exploration of the degree of need for central filing including the patients' names on the one hand, and the adequacy of the provisions to protect against malicious or careless disclosure on the other.

The order of dismissal is therefore reversed, with instructions to the district judge to request the convening of a three-judge court under 28 U.S.C. §§ 2281 and 2284. The temporary restraining order, as modified by this court, is *continued* pending the hearing before such a court and for such further period, if any, as that court may then direct.