**NEW YORK STATE COMMISSION ON CABLE TELEVISION, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

Teleprompter Corporation and WWHT Corporation, Intervenors.

No. 296, Docket 80–4253.

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1981.

Decided Jan. 7, 1982.

Franklin K. Breselor, Asst. Atty. Gen. of State of New York, Albany, N.Y. (Robert Abrams, Atty. Gen. of State of New York, William J. Kogan, Asst. Sol. Gen. of State of New York, Albany, N.Y., of Counsel), for petitioner.

Lisa B. Margolis, Counsel, F.C.C., Washington, D.C. (Stephen A. Sharp, Gen. Counsel, F.C.C., Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., William F. Baxter, Asst. Atty. Gen. of U.S., Barry M. Grossman, Atty. U.S. Dept. of Justice, Washington, D.C., of counsel), for respondents.

Gardner F. Gillespie, Washington, D.C. (Hogan & Hartson, Jay E. Ricks, Paul C. Skelly, Washington, D.C., and Barry P. Simon, New York City, of counsel), for intervenor Teleprompter Corp.

N. Frank Wiggins, Washington, D.C. (Cohn & Marks, Washington, D.C.), for intervenor WWHT Corp.

Before FEINBERG, Chief Judge, FRIENDLY, Circuit Judge, and PIERCE, Circuit Judge.*

PIERCE, Circuit Judge:

Since the inception of the American television era, various ideas, technologies, and services have been developed to enhance the reception of locally-broadcast video signals and to substantially broaden the programming alternatives available to viewers. This case raises the issue of whether the Federal Communications Commission ("FCC") lawfully preempted New York State's regulation of one of those services.

### Background

Among the several options available to some television viewers in New York State are programs delivered by master antenna television ("MATV") systems, by community antenna television ("CATV") systems, and by Multipoint Distribution Service ("MDS").

A MATV system, normally installed in multi-unit dwellings such as apartment houses, consists of a rooftop antenna attached to a network of wires which extend into each living unit of the building. The rooftop antenna receives locally broadcast VHF and UHF signals and relays them to the viewers. Reception is normally improved because of the absence of obstructions and the height of the antenna.

In a CATV or cable television system, broadcast signals are initially received at the CATV station. Distant signals are transmitted to the station via satellite and microwave. The signals are amplified and "cleaned" at the station, and then transmitted to the consumer by cable or wire. *See FCC v. Midwest Video Corp.*, 440 U.S. 689, 697 n.6, 99 S.Ct. 1435, 1440 n.6, 59 L.Ed.2d 692 (1979); *United States v. Southwestern Cable Co.*, 392 U.S. 157, 161–64, 88 S.Ct. 1994, 1996–98, 20 L.Ed.2d 1001 (1968).

A common carrier system in the MDS consists of a fixed station which transmits high frequency signals omnidirectionally to fixed receivers with directional antennas. The signal is intercepted by a parabolic antenna, converted from microwave frequency to a selected lower frequency by a downconverter, passed through a decoder which activates only the intended receivers, and, finally, is displayed on an unused channel on the viewer's television set.[1] Again, in a multi-unit dwelling, a network of wires is utilized to deliver the signal to each unit.

Atop the Empire State Building in New York City is station WQQ–79, which operates under a license granted to Microband Corporation of America ("Microband") by the FCC. It transmits MDS signals to receivers within a 35 mile radius, including points in New York, New Jersey, and Connecticut. Among WQQ–79's customers, for which it transmits programming, is Home Box Office, Inc. ("HBO"), a company which supplies entertainment programs to the viewing public for a fee. WQQ–79 transmits HBO's programming to some 233 MATV and CATV reception points serving an estimated 110,950 subscribers. Like any other customer of a MDS station, HBO provides the programming and specifies the receive points and time of transmission. HBO, however, does not itself market the programming. Instead, it engages the services of middlemen, such as Orth-O-Vision, Inc. ("Orth-O-Vision"), to market its services to apartment dwellers. In order to reach an apartment resident, WQQ–79 typically sends the video material provided by HBO to a rooftop antenna connected to the necessary downconverter and decoder. The signal is then delivered to the customer's home television set through the wires of a MATV system.

In 1972, the New York State legislature created the New York State Commission on Cable Television ("State Commission") and

---

* When this appeal was heard, Judge Pierce was a District Judge for the Southern District of New York, sitting by designation. He was inducted as a judge of this court on November 30, 1981.

1. For a fuller description of MDS, *see In re Application of Midwest Corp.*, 53 F.C.C.2d 294, 296–97 (1975); Report and Order in Docket No. 19493, 45 F.C.C.2d 616, 617–18 (1974).

gave it regulatory jurisdiction over all "cable television systems." N.Y. Executive Law, Art. 28. By statute, a "cable television system" [2] does not include a "master antenna television system." [3] In two orders entitled *Clarification of Policy in Docket No. 90085* dated October 22, 1976 (*"Clarification"*) and *Further Clarification and Modification of Policy* dated April 4, 1977 (*"Further Clarification"*), the State Commission ruled that the statutory definition of a MATV system did not encompass any MATV system which provides pay programming or which allows the reception of programming which could not be received from locally viewable off-the-air broadcast signals. Thus, a MATV system which delivered downconverted and decoded MDS signals was not considered a "master antenna television system" under the statute and would be regulated as a "cable television system." Importantly, such a system could not operate without first obtaining a franchise from the local municipality pursuant to N.Y. Executive Law § 819. [4]

By its "Petition for Expedited Relief" filed on March 11, 1977, Orth-O-Vision, a marketer of HBO's pay television service in the Borough of Queens, New York, requested the FCC to preclude the State Commission from regulating or prohibiting the reception of pay programming sold by Orth-O-Vision which was transmitted from WQQ–79 to MATV systems in multi-unit dwellings in Queens. On March 21, 1977, the FCC placed the petition on public notice [5] and solicited comments from interested parties. [6] In a decision released on September 22, 1978, the FCC, treating Orth-O-Vision's petition as a petition for a declaratory ruling, ruled that the State Commission's policies enunciated in its *Clarification*

2. N.Y. Executive Law § 812(2) defines "cable television system" as:

"any system which operates for hire the service of receiving and amplifying programs broadcast by one or more television or radio stations or any other programs originated by a cable television company or by any other party, and distributing such programs by wire, cable, microwave or other means, whether such means are owned or leased, to persons in one or more municipalities who subscribe to such service. Such definition does not include:

(a) any system which serves fewer than fifty subscribers; or

(b) any master antenna television system; or

(c) any cable television company which serves at least fifty but fewer than one thousand subscribers."

3. N.Y. Executive Law § 812(6) defines "master antenna television system" as:

"any system which serves only the residents of one or more apartment dwellings under common ownership, control or management and any commercial establishment located on the premises of such apartment house and which transmits only signals broadcast over the air by stations which may be normally viewed or heard locally without objectionable interference, and which does not provide any additional service over its facilities."

4. Section 819 states:

"1. Notwithstanding any other law, no cable television system, whether or not it is deemed to occupy or use a public thoroughfare, may commence operations or expand the area it serves after April first, nineteen hundred seventy-three unless it has been franchised by each municipality in which it proposes to provide or extend service.

"2. A municipality shall have the power to require a franchise of any cable television system providing service within the municipality, notwithstanding that said cable television system does not occupy, use or in any way traverse a public street. The provision of any municipal charter or other law authorizing a municipality to require and grant franchises is hereby enlarged and expanded, to the extent necessary, to authorize such franchises.

"3. Nothing in this article shall be construed to prevent franchise requirements in excess of those prescribed by the commission, unless such requirement is inconsistent with this article or any regulation, policy or procedure of the commission."

5. Copies of the public notice were presumably available at the FCC's general information office. See 47 C.F.R. § 0.443. By post-argument letter filed with the Court on November 3, 1981, counsel for the FCC indicated that no announcement of the filing of the petition was published in the Federal Register.

6. Comments in support of the petition were filed by Teleprompter Corporation ("Teleprompter") (an intervenor herein), Microband, The Prism Company, and Micro TV, Inc. Comments in opposition were filed by the State Commission, the City of Rochester, and New York City.

*and Further Clarification* were void as pre-empted "to the extent that their effect will be to prohibit the receipt of federally-authorized MDS transmissions of HBO's programming." *In re Orth-O-Vision, Inc.,* 69 F.C.C.2d 657, 671 (1978) ("First Order"). In subsequently denying the State Commission's petition for reconsideration, the FCC made clear that its prior ruling was not limited to HBO programming, but applied to any MDS transmissions which were impeded by state regulation of MATV systems. *In re Orth-O-Vision, Inc.,* 82 F.C. C.2d 178, 179, 185 (1980) ("Second Order").[7]

■■ In the petition for review now before us,[8] the State Commission contends that the FCC incorrectly found that the State's regulation of MATV systems, as applied, impeded service in the MDS; that even if it did impede MDS service, the State's regulation only affected intrastate MDS transmissions, over which the FCC has no jurisdiction; and, finally, that the FCC's rulings were impermissibly vague.[9] For the reasons stated below, the State Commission's petition for review is denied.

### Discussion

■ Under the Supremacy Clause of the Constitution, Art. VI, cl. 2, a federal law preempts state law when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *see Chicago & North Western Transportation Co. v. Kalo Brick &*

*Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981); *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). Even in an area where Congress has not completely foreclosed state regulation, "a state statute is void to the extent that it actually conflicts with a valid federal statute." *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978); *Jones v. Rath Packing Co.,* 430 U.S. 519, 525–26, 97 S.Ct. 1305, 1309–10, 51 L.Ed.2d 604 (1977). The federal preemptive authority may be "explicitly stated in the [federal] statute's language or implicitly contained in its structure and purpose." *Id.* at 525, 97 S.Ct. at 1309. In determining whether it conflicts with the federal law, the Court must look to the effect, rather than the purpose of the state law. *Perez v. Campbell,* 402 U.S. 637, 652, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971). In a similar vein, the Supreme Court has instructed courts "to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Jones,* 430 U.S. at 526, 97 S.Ct. at 1310.

■ Pursuant to the foregoing guidelines, we will examine the effect of the State Commission's regulation, the FCC's regulatory authority, and finally, the conflict between the two regulatory schemes. Initially, however, we note that the scope of our review of the FCC's declaratory orders is prescribed by 5 U.S.C. § 706(2)(A)–(D).[10]

---

7. Neither FCC Order purported to preempt *all* state regulation of MATV systems. Indeed, the Second Order explicitly stated that not all state regulation of MATV systems would be inconsistent with federal policies. 82 F.C.C.2d at 184 n.10.

8. The State Commission's petition, over which we have jurisdiction pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 402, was originally filed on December 11, 1980. The petition was withdrawn without prejudice on January 19, 1981, but was reinstated on April 15, 1981.

9. At oral argument the State Commission raised an argument that it had not mentioned in its brief but had urged in its petition for reconsideration filed with the FCC, namely,

that the FCC should have proceeded by way of formal rulemaking rather than by way of a declaratory ruling. The choice between rulemaking and adjudication rests within the informed discretion of the administrative agency. *N.L.R.B. v. Bell Aerospace Co.,* 416 U.S. 267, 290–95, 94 S.Ct. 1757, 1769–72, 40 L.Ed.2d 134 (1974); *Brookhaven Cable TV, Inc. v. Kelly,* 573 F.2d 765, 768 (2d Cir.), *cert. denied,* 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1978); *see* 5 U.S.C. § 554(e). The FCC's choice of a declaratory ruling in this case, after notice and an opportunity for comments by interested parties, was not an abuse of discretion.

10. Section 706(2)(E), which requires agency findings and conclusions made pursuant to formal rulemaking procedures to be supported by

Under those provisions, the Court must set aside "agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or action which fails to meet constitutional, jurisdictional, or procedural requirements. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1970). Under the "arbitrary or capricious" standard of review—a "narrow" standard, *id.* at 416, 91 S.Ct. at 823—the Court may only invalidate agency action that is "not based on a consideration of relevant factors" and not rational. *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 803, 98 S.Ct. 2096, 2116, 56 L.Ed.2d 697 (1978); *Citizens to Protect Overton Park, Inc.*, 401 U.S. at 416, 91 S.Ct. at 823. Although our review must be "searching and careful," we are not empowered to substitute our judgment for that of the agency. *National Citizens Committee for Broadcasting*, 436 U.S. at 803, 98 S.Ct. at 2116, *quoting, Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416, 91 S.Ct. at 823; *see Malrite T.V. of New York v. FCC*, 652 F.2d 1140, 1149 (2d Cir. 1981), *cert. pet. filed*, 50 U.S.L.W. 3177 (Sept. 14, 1981).

### A. *Effect of State Commission's Regulation*

Programming transmitted via MDS is received by rooftop antenna, downconverted and decoded, then delivered to the consumer by wire or cable. In the case of a multi-unit dwelling, the MDS reception equipment is attached to a MATV system. Delivery of the MDS signal to each individual viewer is effected through the MATV system's wiring network. In its First Order, the FCC found that in order for Orth-O-Vision customers in Queens to receive material transmitted by MDS, WQQ–79 must use a MATV system to deliver its material from the rooftop reception antenna to home television sets. 69 F.C.C.2d at 668. The FCC found that "the MATV system to which MDS reception equipment is

attached is an integral and necessary part of the transmission of HBO's programming by WQQ–79's signals to Orth-O-Vision's customers." *Id.* The FCC confirmed those findings in its Second Order, and further found that "the provision of pay TV service to apartment buildings and hotels constitutes a significant portion of the services offered by MDS facilities and ... the use of MATV distribution circuitry is generally the most economical way to deliver service in these buildings." 82 F.C.C.2d at 183.

■ The State Commission contends that MATV systems are not integral or necessary for the delivery of MDS signals to residents of multi-unit dwellings, since the signal could be delivered by other means. This argument, however, ignores the FCC's unchallenged finding that delivery of MDS services is most economically provided by MATV circuitry. Further, the slim possibility of an alternative, currently unexercised mode of delivery cannot render arbitrary or capricious an agency finding based on the present state of affairs. In short, the FCC reasonably found that MATV distribution circuitry was a necessary and integral part of MDS service.

After noting the integral connection between MATV systems and the receipt of programming transmitted via MDS, the FCC found that the object of the State Commission's action was to permit municipalities, by denial of franchises, to terminate MDS programming transmitted to multi-unit dwellings, and thereby curtail MDS as a competitor of conventional cable television systems. 69 F.C.C.2d at 662, 666. Notably, the FCC concluded that the practical effect of the State's regulation of MATV systems was to interfere with, burden, and limit service provided by MDS. 69 F.C.C.2d at 668–69; 82 F.C.C.2d at 182–84.

The State Commission claims that the FCC erred in finding that it sought to encourage the denial of municipal franchises to MATV systems attached to MDS receiv-

---

"substantial evidence", is not applicable because the FCC did not and was not required to act through formal rulemaking. *See* note 9

*supra.* Also inapplicable is § 706(2)(F) since the FCC's factual findings are not subject to trial de novo by this Court.

ing equipment, and the State Commission asserts that it has no policy of discouraging the grant of franchises to such MATV systems. We initially note that the State Commission's contention is largely irrelevant since we must consider the *effect* rather than the purpose of the state regulation. In any event, its argument is belied by its admission in the *Clarification*, at 8–9, upon which the FCC relied, that "[w]e anticipate that most [MATV] systems will choose to reduce services to gain the matv system exception and *we encourage them to do so*." (Emphasis supplied).

As to effects, the FCC found that the State Commission's policy had already had an actual impact upon MDS service. On November 17, 1977, New York City denied Orth-O-Vision's application for a cable television franchise. As a result, HBO refused to supply Orth-O-Vision with pay programming for new customers. 69 F.C.C.2d at 662. In its Second Order, the FCC stated that the mere issuance of the State Commission's *Clarification* and *Further Clarification* has had a "chilling effect" upon MDS development in New York City. 82 F.C. C.2d at 184. Based upon the foregoing findings, the FCC reasonably concluded that the State's regulations of MATV systems had an adverse effect on MDS development by allowing and causing a reduction in MDS reception points.

Equally supportable and lawful is the FCC's conclusion that the State's regulation burdened interstate MDS development. The State Commission does not challenge the FCC's findings that the cost of MDS transmission time is fairly constant relative to the number of receive points, and, therefore, a reduction in the number of receive points causes the cost for each program per receiver to increase. 69 F.C.C.2d at 669. Given this relationship, WQQ–79's transmissions cannot, contrary to the State Commission's contention, be split into interstate and intrastate components. A reduction in the number of reception points in New York increases the per viewer cost of transmission to New Jersey and Connecticut. *Id.* In addition, as the FCC noted, "Station WQQ–79 is part of a national network of Microband owned and operated MDS stations in ten states contemporaneously interconnected via a domestic communications satellite." *Id.* at 660. Microband intends to expand its existing services to create a "full-fledged interstate [MDS] network," which would be linked by domestic satellite and terrestrial microwave stations. *Id.* at 660 n.4. This alone gives MDS an interstate character. *See United States v. Southwestern Cable Co.*, 392 U.S. 157, 168–69, 88 S.Ct. 1994, 2000, 20 L.Ed.2d 1001 (1968). Further, given this nationwide link between various MDS stations, the FCC has long considered MDS to be an interstate service. *See Second Report and Order in Docket No. 20490*, 76 F.C.C.2d 273 (1980); *In re Midwest Video Corp.*, 38 F.C.C.2d 897, 899–900 (1973), *reconsideration denied*, 53 F.C.C.2d 294, 300–01 (1975). In sum, the FCC was not arbitrary and capricious in finding that the State Commission's regulation of MATV systems affected interstate communications services provided by MDS.

## B. *The FCC's Regulatory Interest*

In 1934 Congress enacted the Communications Act (the "Act") and created the FCC for the purpose of regulating "communication by wire and radio so as to make available . . . to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service. . . ." 47 U.S.C. § 151. Under 47 U.S.C. § 152(a), Congress directed the FCC to regulate all interstate and foreign communication by wire or radio.[11] *See United States v. Southwestern Cable Co.*, 392 U.S. at 172–73, 88 S.Ct. at 2002–03 (1968). Moreover, the FCC is empowered to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions."

---

**11.** The statutory definitions of "communication by wire" and "communication by radio" include "all instrumentalities, facilities, apparatus, and services (among other things, the re-ceipt, forwarding, and delivery of communications) incidental to such transmission[s]." 47 U.S.C. § 153(a)–(b).

47 U.S.C. § 154(i). Congress gave the FCC broad authority, so as to "maintain, through appropriate administrative control, [the federal government's] grip on the dynamic aspects of radio transmission." *FCC v. Midwest Video Corp.*, 440 U.S. at 696, 99 S.Ct. at 1441, *quoting, FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940).

As to more specific powers of the FCC, Title II of the Act, 47 U.S.C. § 201 et seq., concerns the regulation of common carriers engaged in interstate communications by wire or radio, and Title III of the Act, 47 U.S.C. § 301 et seq., governs the FCC's authority over radio communication. Congress has instructed the FCC to "encourage the larger and more effective use of radio in the public interest," 47 U.S.C. § 303(g), *see National Broadcasting Co. v. United States*, 319 U.S. 190, 219, 63 S.Ct. 997, 1010, 87 L.Ed. 1344 (1943), and to maintain federal control "over all the channels of interstate and foreign radio transmission." 47 U.S.C. § 301. To carry out its mandate, Congress empowered the FCC to "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter . . ." 47 U.S.C. § 303(r).

■ Since MDS operators are communications common carriers, they must adhere to the requirements of Title II. *See* 47 C.F.R. §§ 21.900 et seq. In addition, operators are subject to the licensing require-

ment of Title III because MDS uses radio signals. Contrary to the State Commission's contention, 47 U.S.C. § 152(b) does not bar the FCC's assertion of authority over WQQ–79's MDS transmissions or any other MDS transmissions. Section 152(b) states that the FCC has no jurisdiction to regulate intrastate communication service by wire or radio. As previously discussed, WQQ–79's service and MDS in general is interstate service; thus, § 152(b) is inapplicable.[12]

### C. Conflict in the Regulatory Schemes and the Need for Preemption

Pursuant to the Congressional mandate expressed in the Act, the FCC is empowered to promote the development of a nationwide MDS service. The FCC did not act arbitrarily or capriciously or outside its jurisdiction in finding that "it has an immediate and preeminent interest in the development of MDS service as a whole." 69 F.C.C.2d at 669. The FCC recognized that a nationwide MDS system, comprised of large numbers of MDS reception points linked by domestic satellite and terrestrial microwave stations, could provide simultaneous inexpensive transmission of many different forms of programming.[13] *Id.* In fact, the licensee of station WQQ–79, Microband, is developing such an interstate system. The State Commission's policy, which, as discussed *supra*, has the effect of reducing the number of MDS receive points in New York,[14] could frustrate the development of

12. Further, the jurisdictional constraint of § 152(b) is subject to 47 U.S.C. § 301. Section 301(d) gives the FCC jurisdiction over radio service "within any State when the effects of such use extend beyond the borders of said State." Given the anticipated interconnected nationwide MDS network, intrastate MDS transmissions could reasonably be said to have "effects" outside the state. Of course, WQQ–79's transmissions, which were received in New Jersey and Connecticut as well as New York, certainly had effects outside New York State.

13. MDS is presently limited to two channels. The FCC, however, has proposed rules that might expand the number of channels available to MDS to ten. Notice of Inquiry, Proposed

Rulemaking and Order, General Docket No. 80–112, 45 Fed.Reg. 29323 (May 2, 1980).

14. The FCC's conclusion that the franchise requirement imposed on MATV systems would cause a reduction in MDS reception points in New York was, in part, judgmental and predictive in nature. This, however, does not render arbitrary the FCC's preemption. *See FCC v. WNCN Listeners Guild*, 450 U.S. 582, 595, 101 S.Ct. 1266, 1274, 67 L.Ed.2d 521 (1981); *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. at 813–14, 98 S.Ct. at 2121. The FCC was not required to delay its action so as to be certain that the anticipated effect of the State's policy (i.e. the denial of franchises resulting in the reduction of MDS reception points) actually occurred. *See North Carolina*

an interstate MDS network by increasing the cost for each program per receiver.[15] To allow each State to impose regulations, which, like New York's, effectively reduce the number of MDS receive points would impose an impermissible burden on interstate MDS service. Clearly, the State Commission's policy stands as an obstacle to the FCC's accomplishment of its objective of promoting the development of an interstate MDS network.

■■■ Contrary to the State Commission's contentions, the FCC's preemption order is not invalidated by its failure to impose its own regulations directly upon MATV systems which are used to distribute MDS signals. This Court has upheld the FCC's preemption of state and local price regulation of one type of cable television programming where the FCC's policy was to delay all price regulation so as to allow free-market pricing. *Brookhaven Cable TV, Inc. v. Kelly*, 573 F.2d 765 (2d Cir.), *cert. denied*, 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1978), *aff'g*, 428 F.Supp. 1216 (N.D.N.Y.1977); *see National Association of Regulatory Utility Commissioners v. FCC*, 525 F.2d 630, 646 (D.C.Cir.), *cert. denied*, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976). Federal regulation need not be heavy-handed in order to preempt state regulation.

### Vagueness

■■■ The State Commission's final argument is that the FCC orders are void for vagueness. This argument, founded on the State Commission's recitation of several issues which it contends remain unclear after the FCC's action,[16] was raised in its petition for reconsideration before the FCC. In denying that petition, the FCC rejected the same vagueness arguments raised here and stated "we believe [our First Order] is sufficiently clear in informing [the State Commission] that the establishment of any policy or rule, by definition or any other device, that has the effect of limiting or adversely affecting interstate MDS service is preempted." 82 F.C.C.2d at 185. An agency's adjudicative order, based upon adequately articulated factual and legal premises,[17] is not impermissibly vague simply because borderline hypotheticals could be envisioned which may not be explicitly covered by the order. *See Lafayette Radio Electronics Corp. v. United States*, 345 F.2d 278, 281–82 (2d Cir. 1965); *cf. Erie-Lackawanna Railroad Co. v. United States*, 279 F.Supp. 316, 351 (S.D.N.Y.1967) (three judge court) (Friendly, J.) (administrative agency need not deal with every possibility no matter how unlikely), *modified and remanded, Penn-Central Merger and N & W Inclusion Cases*, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968). Given the fact that the FCC adequately stated the factual and legal underpinnings of its orders and clarified its First Order upon reconsideration, the State Commission's challenge on vagueness grounds is without merit.

### Conclusion

The State Commission's petition for review is denied.

---

*Utilities Commission v. FCC*, 537 F.2d 787, 790–91 n.2 (4th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976). The FCC's finding of a chilling effect and reasoned judgment that the State regulation would cause a reduction in receive points was sufficient to support its conclusion that the State law had an effect on interstate MDS service.

15. The State Commission's contention that the effect of its regulation of Orth-O-Vision on interstate commerce will be minimal is irrelevant, since the FCC is properly concerned with the overall effect of the State's regulation.

16. The State Commission goes so far as to suggest that the FCC's orders could be read to preempt state franchising of conventional cable television systems. This result cannot be gleaned from even a strained reading of the FCC's orders and, in any event, the FCC has specifically disavowed such a policy. Brief for Respondents, at n.51.

17. The sole case relied upon by the State Commission, *Public Media Center v. FCC*, 587 F.2d 1322, 1331–32 (D.C.Cir.1978), merely restates the well-settled proposition that an administrative agency must articulate the reasons for a particular decision to make possible meaningful review of that decision. *See N.L.R.B. v. Columbia University*, 541 F.2d 922, 930 (2d Cir. 1976). Here, the FCC's reasoning was sufficiently stated to enable meaningful review by this Court.