The NEW YORK EYE AND EAR
INFIRMARY, Plaintiff,

v.

Margaret M. HECKLER, as Secretary of
the United States Department of Health
and Human Services, Defendant.

No. 83 Civ. 7158 (LBS).

United States District Court,
S.D. New York.

Sept. 13, 1984.

Garfunkel, Wild & Travis, Great Neck, N.Y., for plaintiff; Norton L. Travis, Great Neck, N.Y., of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendant; Frederick M. Lawrence, Asst. U.S. Atty., New York City, of counsel.

## OPINION

SAND, District Judge.

This action is brought under section 1878(f)(1) of the Social Security Act, as amended, 42 U.S.C. § 1395oo(f)(1) (1982), to review a final determination of the Secretary of Health and Human Services, Margaret Heckler (hereinafter "the Secretary"), denying plaintiff's request for Medicare reimbursement sought pursuant to sections 1814(b) and 1861(v) of the Social Security Act, 42 U.S.C. §§ 1395f, 1395x (1982).

Plaintiff, The New York Eye and Ear Infirmary, is a nonprofit hospital that is certified to participate in the Medicare program as a provider of medical services. On August 19, 1978, plaintiff closed a thirty-three bed nursing care unit on the fourth floor of its facility. The Secretary subsequently determined that the costs associat-

ed with the unit during the period from August 19 through December 31, 1978 were not reimbursable under the Medicare program. Plaintiff contends that the Secretary's decision should not be sustained since (1) it is not supported by substantial evidence, (2) the Secretary's regulations regarding standby costs are unconstitutionally vague, and (3) its decision constituted "rule making" in violation of the procedures required under the Administrative Procedure Act. Both parties have moved for summary judgment pursuant to Fed.R. Civ.P. 56. For the reasons stated below, we conclude that the Secretary's motion for summary judgment should be granted.

## FACTS

Plaintiff is a qualified provider of health care services under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (1982), otherwise known as the Medicare Act. This statute provides for federal reimbursement of medical care for the aged and certain disabled individuals. In order for a provider of medical services to participate in the Medicare program, it must file an agreement with the Secretary in which it agrees not to bill patients who are eligible to receive medical services under Medicare. 42 U.S.C. § 1395cc (1982). In return, the government reimburses providers such as plaintiff for the lesser of its reasonable cost of providing medical services to Medicare beneficiaries or the customary charges for such services. 42 U.S.C. § 1395f(b)(1) (1982).[1]

Medicare reimbursement is made either directly by the Secretary or through the use of a fiscal intermediary. The intermediary makes interim payments to the provider based on the provider's estimated costs; it then adjusts the amount of such payments, if necessary, based on its analysis of the annual cost reports submitted by the provider. After the intermediary conducts its examination of the provider's cost reports, it informs the provider of its reimbursement determination by issuing a written Notice of Program Reimbursement. 42 C.F.R. § 405.1803 (1983). If the provider wishes to challenge this determination and the amount in controversy is $10,000 or more, it may request a hearing before the Provider Reimbursement Review Board (hereinafter "the PRRB"). 42 U.S.C. § 1395oo(a) (1982). The PRRB's decision may be affirmed, reversed, or modified by the Secretary, on her own motion, within sixty days after the provider is notified of the decision. 42 U.S.C. § 1395oo(f)(1) (1982). The provider may obtain judicial review of the Secretary's decision. *Id.*

The "reasonable costs" for which a provider may receive reimbursement are basically the costs actually incurred by the provider, less any costs deemed to be unnecessary in the efficient delivery of medical services. 42 U.S.C. § 1395x(v)(1)(A) (1982).[2] This phrase is further defined, by regulations promulgated by the Secretary, to include "all necessary and proper ex-

---

**1.** At all times relevant to the instant case, plaintiff's costs incurred in providing health care services to Medicare beneficiaries were less than the "customary charges" for such services. *See* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, at 4.

**2.** The statutory definition of "reasonable costs" provides:

(1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; except that in any case to which paragraph (2) or (3) ap-

plies, the amount of the payment determined under such paragraph with respect to the services involved shall be considered the reasonable cost of such services ... Such regulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance

penses incurred in rendering services ... includ[ing] both direct and indirect costs and normal standby costs." 42 C.F.R. § 405.451(a), (c)(3) (1983).[3] Necessary and proper costs are "costs which are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs which are common and accepted occurrences in the field of the provider's activity." 42 C.F.R. § 405.451(b)(2) (1983). The phrase "standby costs" is not defined further by statute or regulations.

On August 19, 1978, plaintiff discontinued operation of a thirty-three bed nursing unit on the fourth floor of its 199 bed facility. During the period from August 19 to December 31, 1978, patients previously treated in this unit were transferred to the fifth floor. Plaintiff performed various painting, cleaning and maintenance services in the fourth floor unit during this period. Although no patients were admitted to the unit subsequent to its closing, all beds and equipment remained in the unit during the period in dispute. During the months prior to the time the unit was closed, plaintiff's average occupancy rate was approximately 56% of capacity and plaintiff maintained other unused space in its facility.[4]

■ On May 30, 1980, plaintiff's fiscal intermediary, Blue Cross/Blue Shield of Greater New York, Inc., notified plaintiff that the costs associated with the closed unit for the period beginning August 19, 1978 through December 31, 1978, amounting to $47,331, were not reimbursable under the Medicare program.[5] Plaintiff appealed this decision to the PRRB, which, on May 23, 1983, reversed the intermediary's determination and found that these costs were reimbursable. On July 21, 1983, the Secretary reversed the PRRB's decision, concluding that the costs incurred in maintaining the closed unit were not "reasonable costs" within the meaning of the Medicare Act and regulations and thus were not reimbursable by Medicare.[6] On September 29, 1983, plaintiff commenced this action, seeking judicial review of the Secretary's decision.

## DISCUSSION

### A. Substantial Evidence

Plaintiff contends that the Secretary's determination that the costs associated

---

programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive. 42 U.S.C. § 1395x(v)(1)(A) (1982).

3. The regulations provide that
[t]he determination of reasonable cost of services must be based on cost related to the care of beneficiaries of title XVIII of the Act. Reasonable cost includes all necessary and proper expenses incurred in rendering services, such as administrative costs, maintenance costs, and premium payments for employee health and pension plans. It includes both direct and indirect costs and normal standby costs. However, where the provider's operating costs include amounts not related to patient care, specifically not reimbursable under the program, or flowing from the provision of luxury items or services (that is, those items or services substantially in excess of or more expensive than those generally considered necessary for the provision of needed health services), such amounts will not be allowable. The reasonable cost basis of reimbursement contemplates that the providers of services would

be reimbursed the actual costs of providing quality care however widely the actual costs may vary from provider to provider and from time to time for the same provider. 42 C.F.R. § 405.451(c)(3) (1983).

4. Plaintiff's average occupancy rate, taking into account the closing of the fourth floor unit, was 59.6% (R. 9) (References to the Administrative Record are cited as "R.——").

5. This cost disallowance resulted in a loss of Medicare reimbursement of approximately $15,354. R.8; Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, at 9.

6. It should be noted that the difference of opinion between the PRRB and the Secretary (as represented by the Administrator of the Health Care Financing Administration) does not affect this Court's standard of review or the deference to be accorded to the Secretary's decision. See, e.g., Sun Towers, Inc. v. Heckler, 725 F.2d 315, 326 (5th Cir.1984); American Medical International, Inc. v. Secretary of Health, Education and Welfare, 466 F.Supp. 605, 611–12 (D.C.D.C. 1979), aff'd, 677 F.2d 118 (D.C.Cir.1981); Medical Center of Independence v. Harris, 628 F.2d 1113, 1117 (8th Cir.1980).

with the closed nursing unit were not reimbursable is not supported by substantial evidence. Specifically, plaintiff argues that the record does not support the Secretary's conclusion that these costs were not "normal standby costs" and that such costs were not necessary for the efficient delivery of health care services.

Under the standards set forth in the Medicare Act, the decision of the Secretary must be upheld unless plaintiff demonstrates that it is not supported by substantial evidence in the record as a whole. *See* 42 U.S.C. § 1395*oo*(f)(1) (1982); 5 U.S.C. § 706(2)(E) (1982). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

■ The Secretary's conclusion that the costs associated with plaintiff's unused nursing unit were not necessary to the efficient delivery of medical services was based on a number of factors. The record reveals that plaintiff's decision to close the unit was based on its declining patient census. Plaintiff's occupancy rate during 1978 was approximately 56%; thus, on the average, almost one-half of its entire facility was unoccupied during that year. At or about the time of the closing, other unoccupied parts of the facility were available for patient use; even taking into account the closing of the fourth floor unit, plaintiff's average occupancy rate was still below 60% of capacity. During the period in dispute, plaintiff engaged in painting, maintenance and major cleaning of the unit, and reassigned all hospital staff to other floors of its facility. Although hospital equipment was left in the fourth floor unit at all times during this period, there is no evidence that this unit was in any way used to provide patients with medical services. In short, it was entirely appropriate for the Secretary to conclude that the costs associated with maintaining this unit were not incurred in order to provide for the efficient delivery of medical services to Medicare beneficiaries.

■ Plaintiff's disagreement with the Secretary's conclusion may be distilled into three contentions. First, plaintiff asserts that the costs of maintaining the closed unit are reimbursable as normal standby costs. Plaintiff argues that under the Secretary's definition of standby costs as costs which "may arise from unused bed capacity for which there is a foreseeable use in the proximate future,"[7] plaintiff is entitled to reimbursement for the costs associated with its closed fourth floor unit. Plaintiff points to evidence in the record that this unit was left unoccupied in anticipation of increased patient admissions and a resulting need for additional beds in the future.[8] Nevertheless, the record reveals not only a declining patient enrollment in the facility, but also the availability of other space which, on an annual basis, constituted approximately 40% of the facility's total capacity; this space could presumably have

---

**7.** Plaintiff also challenges the absence of any statutory or regulatory definition of the phrase "standby costs," *see* pages 403–405 *infra* (vagueness challenge), and the manner in which the Secretary interpreted the phrase in the instant case. *See* pages 405–406 *infra* (Administrative Procedure Act claim).

**8.** *See* R.91 (letter of Harry J. Wilbert, plaintiff's Assistant Administrator of Fiscal Affairs, to PRRB). Plaintiff also relies on an affidavit of Mr. Wilbert which contains averments regarding the overcapacity of the facility both prior to and subsequent to August 19, 1978. The affidavit is offered in support of plaintiff's argument that as of August 19, 1978, use of the closed unit

in the near future was reasonably foreseeable. *See* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, at 34. Since this affidavit was not part of the record before the Secretary, it cannot now be introduced in order to challenge the Secretary's decision. *See Armored Carrier Corp. v. United States*, 260 F.Supp. 612, 617 (E.D.N.Y.1966) (three-judge court), *aff'd*, 386 U.S. 778, 87 S.Ct. 1476, 18 L.Ed.2d 524 (1967); *Beverly Enterprises v. Califano*, 446 F.Supp. 599, 607 (D.C.D.C.1978). In any event, the evidence contained therein does not alter our conclusion regarding the existence of substantial evidence supporting the Secretary's determination.

been used to accommodate even a significant increase in patient admissions. At the same time, the closed unit was undergoing major cleaning, painting and maintenance work. The fact that plaintiff did not intend to permanently close the unit, *see* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (hereinafter "Plaintiff's Memorandum of Law"), at 42, does not render the costs incurred in maintaining it reimbursable. Under the Secretary's definition, standby costs do not include costs associated with every temporary closing of a facility or unit therein; rather, the reimbursement decision hinges on a fact-specific determination of whether the closed unit can be expected to be utilized in the near future.[9] Based on the above evidence, the Secretary's conclusion that the amounts in dispute were not reimbursable standby costs is both supported by substantial evidence [10] and is unrebutted by persuasive evidence to the contrary.[11]

**9.** The difficulty with the evidence introduced by plaintiff in support of its position was emphasized by Monica D. Cook, the Director of Provider Appeals for Blue Cross/Blue Shield:

The Provider contends that they are entitled to reimbursement of their stand-by costs because the associated space had been disused for a "temporary" period of time.

In the Intermediary's opinion, the evidence presented by the Provider to advance this contention and used by the Board upon which to base its decision could have been presented in evidence to advance *the same contention even if the Provider had had only one year of "temporary" disuse of the space, or two years, or five years or even ten years.*

R.17 (letter to Irwin Cohen, Attorney-Advisor, Health Care Financing Administration, Department of Health and Human Services) (emphasis in original).

**10.** Plaintiff contends that the Secretary improperly relied upon evidence that the fourth floor unit remained closed for two years subsequent to the period in dispute, and was eventually converted into administrative office space, in support of her conclusion that future use of the unit was not reasonably foreseeable. *See* Plaintiff's Memorandum of Law, at 35–38. While we agree with plaintiff's argument that the use of such hindsight is "inappropriate," *id.* at 35, we do not agree that the Secretary actually relied upon such evidence in making her decision. Although the Secretary did make specific find-

■ Second, plaintiff argues that the costs in dispute were allowable as "necessary and proper" costs. Necessary and proper costs include "costs which are common and accepted occurrences in the field of the provider's activity." 42 C.F.R. § 405.451(b)(2) (1983). According to plaintiff, the practice of closing units due to excess capacity is widespread in the New York City hospital industry, and thus the costs associated with it were "necessary and proper." *See* Plaintiff's Memorandum of Law, at 51. The Secretary instead concluded that "[e]ven if such conditions were widespread in the industry, this would not be considered a common and accepted practice." R. 5. The Secretary's interpretation, while somewhat troubling at first blush, must be read in conjunction with her other conclusions and the regulations as a whole. This interpretation is entirely consistent with the case-by-case evaluation of medical facility closings which the Secretary reasonably believes necessary to de-

ings of fact regarding plaintiff's use of the closed unit subsequent to December 31, 1978, *see* R.8–9 (Findings of Fact 4, 5, 9, 10), the Secretary herself recognized that the use of such evidence is "unfair" and that "[t]he evaluation of reasonable judgments must come from evidence available at the time of the decision or soon thereafter." R.8. We therefore find it difficult to conclude that the Secretary actually *relied* on these factual findings in reaching her decision. In any event, we conclude that the Secretary's decision is supported by substantial evidence in the record, even if the aforementioned findings of fact are disregarded.

**11.** Plaintiff notes that the New York State Commissioner of Health has authority to determine hospital bed capacity. *See* Plaintiff's Memorandum of Law, at 48–49. Plaintiff then argues that the Commissioner's failure to decertify the fourth floor unit until January 1, 1981 demonstrates that the unit remained necessary for patient care up until that time. *See id.*

This argument is unpersuasive. First, we find no indication in the record that plaintiff ever sought the approval of the Commissioner to reduce bed capacity for the period in dispute. Second, and more important, it is the Secretary's determination of whether federal statutory and regulatory standards were satisfied, and not the state health authority's administration of its own legislative scheme (with its differing criteria), which is relevant to the resolution of the instant case.

termine Medicare reimbursability. *See* R. 5 ("each such case would need to be evaluated on its own facts."). Thus, it is the specific facts underlying a particular closing—the extent and anticipated duration of the closing, the circumstances giving rise to it, the occupancy rate of the facility at the time—and not the mere prevalence of the closing practice in the industry, which is determinative of whether the costs in dispute are "necessary and proper." The prevalence of an industry practice may merely be indicative of widespread inefficiency, for example, a practice of keeping a hospital floor open so long as one patient occupies it. The Secretary's refusal to be bound by industry practice in the *per se* manner suggested by plaintiff is thus consistent both with the Medicare Act's limitation of reimbursable costs to those which are necessary to efficiently provide medical services and with the regulation's implementation of this statutory command. The Secretary's interpretation and application of the regulation is neither irrational nor unsupported by substantial evidence in the record.

Finally, plaintiff argues that the Secretary's decision is inconsistent with the underlying purposes of the Medicare Act. Plaintiff contends that because the Medicare Act reimburses and thus implicitly encourages the efficient delivery of medical services, the disallowance of the costs at issue effectively penalizes plaintiff for what was undeniably an efficient and cost-conscious business decision.

 This argument cannot withstand careful scrutiny. Even assuming that the closing of the fourth floor unit was designed to eliminate the inefficiency of operating all units of a significantly underutilized facility, this does not automatically convert the costs of maintaining that closed unit into costs which are necessary to the efficient delivery of medical services. Otherwise, the costs associated with an unutilized unit which is permanently closed for efficiency reasons would be similarly reimbursable as an inducement or reward for provider efficiency. It is doubtful, however, that this result was intended by Congress when it enacted the Medicare reimbursement program. More broadly stated, the Medicare Act's purpose is to provide reimbursement for necessary costs incurred in providing health care services to Medicare beneficiaries, and not to simply reward providers for economically efficient or prudent business decisions.[12] In addition, this reimbursement scheme, as construed by the Secretary, does not encourage provider *in*efficiency in the manner suggested by plaintiff. If plaintiff had in fact kept the fourth floor of its facility open in order to treat a single patient, it is by no means "incontrovertable" that the costs associated with the unit would have been reimbursable. *See* Reply Memorandum of Law in Further Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, at 26 (hereinafter "Plaintiff's Reply Memorandum"). Even though the Secretary has not promulgated minimum occupancy rates for providers, the Secretary still could have reasonably concluded that the costs incurred in operating such an underutilized unit were unnecessary in the "efficient delivery" of medical services, especially if other space was available in the facility for patient care. In sum, the Secretary's decision represents little more than a reasonable limitation on the scope of reimbursable costs which is consistent with both the language and purpose of the Medicare Act and regulations.

B. *Vagueness*

 Plaintiff seeks a declaration that the Secretary's regulations regarding

---

12. *See, e.g.,* 42 U.S.C. § 1395f(b)(1) (1982): even where providers are able, as the result of superior efficiency or otherwise, to incur costs which are below the customary charges for similar services, the Medicare Act provides reimbursement only for the lesser of these two amounts. Thus, the lower the provider's actual costs, the lower the amount of its Medicare reimbursement. The Secretary's refusal to reimburse plaintiff for the costs incurred in maintaining its more efficiently utilized (*i.e.,* closed) unit is consistent in purpose with the above reimbursement formula.

standby costs are unconstitutionally vague. Plaintiff contends that the absence of a statutory or regulatory definition of the phrase renders it susceptible to potentially arbitrary and erroneous application.[13] Plaintiff points specifically to the apparent confusion of plaintiff's fiscal intermediary in interpreting the phrase, *see* R. 17 (letter of Monica D. Cook, Director of Provider Appeals, Blue Cross/Blue Shield of Greater New York, Inc.), and a more concrete definition which was proposed by the fiscal intermediary, *see* R. 32 (letter of Merrick W. Jacoby, Medicare Executive Director, Blue Cross/Blue Shield Association)[14] in support of its vagueness challenge.

A statute or regulation is unconstitutionally vague only if its meaning is so ambiguous or unclear that persons " 'of common intelligence must necessarily guess at its meaning.' " *Broadrick v. Oklahoma,* 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973) (*quoting Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). A statute or regulation will be upheld so long as it gives fair notice of the conduct or activities to be proscribed or included. In addition, the standard of review to be applied in the instant case is less strict than that utilized in cases involving a criminal statute or a statute infringing on constitutionally protected freedoms. *See Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982); *Lang v. Berger,* 427 F.Supp. 204, 210 (S.D.N.Y.1977) (Weinfeld, J.). Consistent with this fairly deferential standard, two courts which have examined the constitutionality of various Medicare and Medicaid provisions have rejected vagueness challenges.[15]

Applying the above standards, we conclude that plaintiff's vagueness challenge must fail. Although the phrase "standby costs" is not defined by statute or regulation, it is not wholly without an interpretive frame of reference. The phrase "standby costs" is used in a number of specific contexts in the Secretary's Provider Reimbursement Manual, *see* Medicare & Medicaid Guide (CCH) ¶¶ 4830 (asset retired from active service but held for standby or emergency services may be depreciated), 5889 (permitting reimbursement for costs in-

---

**13.** The Medicare Act provides that qualified providers shall be reimbursed for reasonable costs, "excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services ...." 42 U.S.C. § 1395x(v)(1)(A) (1982). The regulations provide that "[a]ll necessary and proper expenses of an institution in the production of services, including normal standby costs, are recognized[,]" 42 C.F.R. § 405.402(a) (1983), and that reasonable costs "include[ ] both direct and indirect costs and normal standby costs." 42 C.F.R. § 405.451(c)(3) (1983).

**14.** The letter provides, in pertinent part:

In the case of a declining patient load, it may be appropriate for some space to be designated as stand[b]y capacity until utilization trends became clear. At the end of a period of time the standby capacity would either be upgraded for patient use or downgraded to unnecessary standby space ....

While recognizing standby capacity for program reimbursement purposes, guidelines must be incorporated into the proposed manual revision for determining when space is deemed to have become permanently idle ...

In a situation where a provider has completed and is using new facilities and has no intention of putting the old space back into use, the determination that the old space is permanently idle is relatively clear. Other situations are often not so clear....

[W]here no reliable evidence as to the permanency of the idleness exists, a practical rule must be used. The rule which we suggest is that, if space remains idle for more than one cost reporting period, the space is permanently idle and costs associated with it are to be disallowed.

R.32–33.

**15.** In *Lang v. Berger, supra,* the court held that the use of the phrases "care of poor and unacceptable quality" and "provision of excessive, unnecessary, professionally unacceptable, unproven or experimental care" in a New York State medical handbook were not unconstitutionally vague. In *Association of American Physicians and Surgeons v. Weinberger,* 395 F.Supp. 125 (N.D.Ill.), *aff'd,* 423 U.S. 975, 96 S.Ct. 388, 46 L.Ed.2d 299 (1975), the phrases "medically necessary," "professionally recognized health care standards," and "proper care" were held to be sufficiently specific so as to withstand a vagueness attack.

curred in guaranteeing a doctor compensation for being available on a standby basis to handle emergencies), 6191E (cost of holding a room during a patient's leave of absence considered "synonymous with standby costs") (1983). The Provider Reimbursement Manual represents the Secretary's interpretation of the Medicare Act and regulations, and is entitled to be given important significance. *See Sun Towers, Inc. v. Heckler,* 725 F.2d 315, 325 n. 16 (5th Cir.1984); *Hunana of Kentucky, Inc. v. Harris,* [1981–1982 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 31,610 (W.D.Ky. Feb. 13, 1981). The Manual's repeated use of the phrase "standby costs" provides a fairly discernible idea of the phrase's meaning and intended application, namely, costs incurred in connection with assets or services which are likely to be utilized in the near future or in handling emergencies. In fact, the Manual's use of the phrase is entirely consistent with both its ordinary or plain meaning as well as the meaning assigned to it by the Secretary in the instant case. *See* R. 7 (describing standby costs as costs which "may arise from unused bed capacity for which there is a foreseeable use in the proximate future"). Even though more precise criteria might be developed for determining whether costs are allowable as "standby costs," *see* fn. 14 *supra*, the Constitution does not require maximum specificity or clarity. Admittedly, the Secretary's use of the phrase "standby costs" will inevitably entail an ad hoc, case-by-case explication of its specific meaning based on its application in particular factual situations. But, as long as providers are given fair notice of the legal standards for reimbursement, Congress is permitted to use standards which enable it to "maintain enough flexi-

bility to cover a variety of medical cases." *Association of American Physicians and Surgeons v. Weinberger,* 395 F.Supp. 125, 139 (N.D.Ill.), *aff'd,* 423 U.S. 975, 96 S.Ct. 388, 46 L.Ed.2d 299 (1975). Based on the Secretary's prior use of the phrase and its ordinary connotation, we conclude that the phrase "standby costs" is not unconstitutionally vague.

*C. Administrative Procedure Act*

 Having concluded that the Secretary's decision is supported by substantial evidence in the record, her decision must be sustained unless found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A) (1982). Plaintiff contends that the Secretary's interpretation of the phrase "standby costs," a phrase which is undefined in the Medicare Act or regulations promulgated thereunder, constituted "rule making" in violation of the notice, hearing, and publication procedures established by the Administrative Procedure Act (hereinafter "the APA"), 5 U.S.C. § 553 (1982).[16] Defendant argues that the Secretary's interpretation of the phrase was simply a normal interpretation of a specific legal standard, an event which is often incidental to the adjudication of an individual claim.[17] We agree with the defendant's characterization of the Secretary's decision in the instant case.

 The Secretary has broad discretion under the APA to formulate interpretations of her regulations through the process of adjudication rather than rule making. *See N.L.R.B. v. Bell Aerospace Co.,* 416 U.S. 267, 293–94, 94 S.Ct. 1757, 1771–72, 40 L.Ed.2d 134 (1974); *Cheshire Hospital v. New Hampshire-Vermont Hospitalization Service, Inc.,* 689 F.2d 1112, 1122–23 (1st

---

**16.** The APA defines "rule making" as the "agency process for formulating, amending, or repealing a rule[.]" 5 U.S.C. § 551(5) (1982). "Rule" is defined in pertinent part as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency ...." 5 U.S.C. § 551(4) (1982).

**17.** "Adjudication" is defined as the "agency process for the formulation of an order[.]" 5 U.S.C. § 551(7) (1982). "Order" is defined as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing[.]" 5 U.S.C. § 551(6) (1982).

Cir.1982) (interpretation of Medicare regulation). The choice between rule making or adjudication as a method of developing interpretations of statutory standards "is one that lies primarily in the informed discretion of the administrative agency." *N.L.R.B. v. Bell Aerospace, supra,* 416 U.S. at 293, 94 S.Ct. at 1771 (*quoting SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947)); *N.L.R.B. v. A.P.W. Products Co.,* 316 F.2d 899, 905 (2d Cir.1963) (Board's reversal of back-pay award tolling policy via adjudicative process held permissible; "adjudicative process of ... agencies ... gives birth to "rules," which may apply for the past, for the future, or, more generally, for both.").[18]

■■■ The Secretary's interpretation and application of the "standby costs" standard was well within the realm of permissible adjudicative decisionmaking to which the APA's rule making procedures do not apply. Admittedly, the phrase "standby costs" as it is used in the Medicare Act and regulations appears to have been given precise content for the first time in the instant case. However, the mere novelty of the interpretation does not convert the agency's interpretive behavior into "rule making." Moreover, the phrase was not completely without an interpretive frame of reference; as noted earlier, the Provider Reimbursement Manual's use of the phrase

afforded it at least some rudimentary level of general scope and applicability. And although plaintiff claims that the Secretary's decision represents a change in past reimbursement practices upon which plaintiff relied, and thus should have complied with APA rule making procedures, *see N.L.R.B. v. Bell Aerospace, supra,* 416 U.S. at 294–95, 94 S.Ct. at 1771–72, plaintiff has failed to produce any precedents or prior interpretations establishing a different meaning of the phrase. Indeed, since the determination of whether costs are "reasonable costs" or allowable "standby costs" implicitly involves a case-by-case application of a general legal standard to specific facts, the use of the Secretary's definition will by no means necessarily result in a departure from prior reimbursement practice.[19] We conclude that the Secretary's interpretation of the phrase "standby costs" in an adjudicative setting did not violate the APA.

## CONCLUSION

For the foregoing reasons, we conclude that the Secretary's decision was supported by substantial evidence, the phrase "standby costs" is not unconstitutionally vague, and the Secretary's interpretation of the phrase did not violate the requirements of the Administrative Procedure Act. Plaintiff's motion for summary judgment is de-

---

**18.** In support of its argument, plaintiff cites *Ford Motor Co. v. Federal Trade Commission,* 673 F.2d 1008, 1009 (9th Cir.1981), *cert. denied,* 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 394 (1982), for the proposition that "an agency must proceed by rule making if it seeks to change the law and establish rules of widespread application." *See* Plaintiff's Reply Memorandum, at 19–21. This legal conclusion has been criticized as both overstated and contrary to precedent, and does not appear to represent the law in this circuit. *See* K. Davis, Administrative Law § 7.25, at 181–86 (Supp.1982); *see also New York State Commission on Cable Television v. Federal Communications Commission,* 669 F.2d 58, 62 n. 9 (2d Cir.1982); *N.L.R.B. v. A.P.W. Products Co., supra,* 316 F.2d at 905. In any event, we conclude that even this novel legal standard has not been satisfied. *See* text accompanying note 19 *infra.*

**19.** *Cf. St. Francis Memorial Hospital v. Weinberger,* 413 F.Supp. 323 (N.D.Cal.1976) (Provider

Reimbursement Manual promulgation of Medicare rule governing capitalization of interest costs held violative of rule making provisions of APA where new rule "clearly altered" prior rules governing interest payments and constituted an inflexible rule barring reimbursement for previously reimbursable costs). It should be noted that *St. Francis,* cited by plaintiff, did not involve conduct of the Secretary occurring in the course of an administrative, adjudicatory proceeding. Rather, the court examined the question of whether a rule issued in the Secretary's Provider Reimbursement Manual was an "interpretative" rule, exempt from the APA's notice, hearing and publication requirements, *see* 5 U.S.C. § 553(b)(A) (1982), or a substantive rule, subject to these requirements. *Id.* at 327–31. Neither party to the instant case argues that the Secretary's conduct constituted "interpretative" rule making.

nied, and defendant's motion for summary judgment is granted.

SO ORDERED.